976 A.2d 413

THE PRESBYTERIAN HOME AT PENNINGTON, INC., PLAIN-TIFF–APPELLANT/CROSS–RESPONDENT, v. THE BOROUGH OF PENNINGTON, DEFENDANT–RESPONDENT/CROSS–APPELLANT.

THE BOROUGH OF PENNINGTON, PLAINTIFF–RESPONDENT/CROSS–APPELLANT, v. THE PRESBYTERIAN HOME AT PENNINGTON, INC., DEFENDANT–APPELLANT/CROSS–RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued October 29, 2008—Decided August 10, 2009.

Before Judges CUFF, FISHER and BAXTER.

*Bruce W. Clark* argued the cause for appellant/cross-respondent (*Dechert LLP*, attorneys; *Mr. Clark*, on the briefs).

*Walter R. Bliss, Jr.*, argued the cause for respondent/cross-appellant (*Mr. Bliss* and *Virginia Kerr*, attorneys, of counsel and on the brief).

*Drinker Biddle & Reath LLP*, attorneys for amici curiae New Jersey Association of Homes and Services for the Aging and New Jersey Hospital Association (*Ross A. Lewin*, on the brief).

*DiFrancesco, Bateman, Coley, Yospin, Kunzman, Davis & Lehrer, PC*, attorneys for amicus curiae New Jersey State League of Municipalities (*Martin Allen*, of counsel; *Mr. Allen* and *Joshua H. Beinhaker*, on the brief).

The opinion of the court was delivered by

CUFF, P.J.A.D.

In this appeal, we consider the interpretation of a 1993 amendment to *N.J.S.A.* 54:4–3.6, which declares that the real property of various health care providers is exempt from local real estate taxes. At issue is whether an assisted living facility must provide charity care in order to qualify for the exemption. The Tax Court judge held that an assisted living facility must do so before qualifying for the exemption, and declared that plaintiff was not entitled to tax exempt status. We disagree and reverse.

I

Plaintiff, The Presbyterian Home at Pennington, Inc. (PHP), is a nonprofit corporation affiliated with Presbyterian Homes and Services (PHS), which also is a nonprofit corporation. On October 1, 2001, PHP purchased Stony Brook Assisted Living (Stony

Brook), located at Route 31 and West Franklin Avenue in Pennington from New Jersey Property Titles Holdings I, LLC for $13,300,000. Stony Brook had been organized as a for-profit organization but had not commenced operation prior to its sale to PHP. PHP applied for tax exempt status for the tax year 2002. By letter dated October 24, 2001, defendant, Borough of Pennington (Pennington), denied PHP's application for tax exempt status. Pennington assessed the property's value at $1,042,800 for land and $8,286,200 for improvements; the tax calculated was $74,860.41.

On April 1, 2002, PHP filed a complaint in the Tax Court challenging Pennington's decision to deny it a real estate tax exemption for tax year 2002. Thereafter, Pennington revised its tax list to identify PHP's property as tax exempt in order to protect Pennington from undue exposure in connection with its ratable-based obligations for the school district for which Pennington collected taxes.

On May 23, 2003, however, Pennington filed a complaint in the Tax Court seeking reversal of the exemption it granted PHP for 2003. Another complaint filed on June 4, 2004, sought similar relief for the 2004 tax year. Although never formally consolidated, the parties' cross-motions for summary judgment addressed the three complaints, all of which present a common issue.

The following facts are taken from PHP's motion for summary judgment:

PHP's Stony Brook facility has ninety-six units including nineteen or twenty units for Alzheimer's and other memory-impaired patients. Its 2003 monthly rates were $3538 for a studio, $4178 for a one bedroom unit, and $5032 for Alzheimer's care. New residents pay a community fee of $2500, of which $2250 is returned if the application is rejected. The community fee is applied to capital replacement and facility repairs.

At the time of the summary judgment motions, Stony Brook's primary market area was within a ten-mile radius of the facility

with the exception of the state of Pennsylvania and "sections of Trenton." For marketing purposes, PHS considered "Income Qualified Households" to be those with an annual income over $35,000. It forecast that the assisted living facility "will generally be filled by individuals with incomes over $35,000 and individuals with incomes between $15,000 and $35,000 who own their own home sufficient to cover the monthly fees and other estimated living expenses." Stony Brook made no efforts to market its facility to Medicaid eligible residents. Ten percent of the units are reserved for Medicaid-eligible persons.

The facility opened for its first residents on February 4, 2002. PHP and PHS executed a facility management agreement, dated October 1, 2001, under which PHS agreed to provide management and administrative support services for Stony Brook, subject to PHP's "general supervision." Both PHP and PHS are qualified as tax exempt under section 501(c)(3) of the Internal Revenue Code. PHP's affairs are governed by a Board of Trustees, all of whom are uncompensated with the exception of the president. PHP owns no other real property.

PHP's August 30, 2000 certificate of incorporation states that it was "organized exclusively for charitable purposes within the meaning of section 501(c)(3) of the Internal Revenue Code, or the corresponding section of any future federal tax code." PHP's bylaws set forth its purposes as follows:

2.1 *Purposes.* [PHP] is organized exclusively for charitable purposes within the meaning of section 501(c)(3) of the Internal Revenue Code, or the corresponding section of any future federal tax code (the "Code"), including without limitation:

(a) To provide elderly, disabled and other needy persons with housing facilities, medical, nursing and physical care, understanding, companionship and other services to help them lead satisfying lives, including, without limitation, the establishment of homes, communities, facilities and services to carry out this purpose;

(b) To develop and maintain other housing facilities and health and welfare services, programs or facilities for persons of any age to help meet social needs;

(c) To cooperate with health care providers through joint ventures or other arrangements to better serve the health care needs of the communities [PHP] serves;

(d) To render to any persons, whether residing in facilities maintained by [PHP] or any organization affiliated with [PHP], or residing elsewhere, community

outreach services and charitable assistance when circumstances warrant such services and assistance and when funds for such charitable assistance are available;

(e) To provide meals, nutritional, medical and housekeeping services, assistance in daily living and other charitable assistance to needy individuals;

(f) To furnish services, facilities, and charitable assistance without regard to a person's sex, race, creed, color or national origin; and

(g) To make distributions to charitable organizations described in section 501(c)(3) of the [Internal Revenue] Code in furtherance of [PHP]'s purposes.

PHS was founded in 1916 by the Presbyterian Church, but those entities are no longer legally connected. At the time of the cross-motions, PHS was comprised of various affiliated nonprofit corporations that own and operate four continuing care retirement communities, three assisted living facilities, one personal care home, and fourteen affordable housing facilities. PHS also provides consulting and management services to municipalities and other organizations that want to provide retirement housing programs. The Presbyterian Homes of New Jersey Foundation, Inc. (the Foundation) is the charitable arm of PHS that raises money to "provide[ ] funding for residents who can no longer pay the cost of their care." From 1998 to July 2003, the Foundation provided $502,705.79 in assistance to sixteen residents of PHS communities.

Under the October 1, 2001 management agreement between PHP and PHS, PHS was provided with "complete authority and power" over personnel, financial procedures, contracts with suppliers and third parties, collection and disbursement of funds, insurance, and facility maintenance. In exchange, PHP paid PHS an annual fee of five percent of its revenues.

In addition to the management fee under the agreement, PHS charged PHP separately for Stony Brook's executive director's compensation, for information technology (IT) services, and centralized accounting and legal services. PHP's executive director is an employee of PHS and her compensation is charged to PHP at cost. PHS's cost for providing IT services is allocated among its various facilities based on usage. There is a similar arrangement for financial and legal services based on time expended or transactions completed.

PHS's vice president of finance, Garrett Midgett, certified that it was PHS's intention in allocating the centralized costs to provide a "reasonable and fair method" of charging costs to the affiliated facilities. PHS's general counsel, Maureen Cafferty, certified that the percentage cost of legal services allocated to PHP did not exceed, and more likely was below, the percentage of time she actually spent providing legal services to it. PHP required more legal services because it had far more employees than the affordable housing facilities, and its status as an assisted living residence implicated ongoing licensure, regulatory, and health care law issues.

Eric Gurley, PHS's senior vice president of finance and its chief financial officer, certified on information and belief that in PHS's ninety-year history none of its affiliated senior care facilities

> ha[d] ever evicted a resident who, through no fault of their own, ha[d] become unable to afford the charges for their care. I knew this is true [sic] for the entire period that I have been working at [PHS] since 1992. PHP's goal is to operate the same way, and to maintain such residents even after they have spent down their funds.

Although PHP "can make no binding promises" that residents would not be evicted for inability to pay, Gurley explained that was because PHP could not guarantee that there would be funds from its resources, PHS, or the Foundation to subsidize a resident who had spent his or her own assets and for some reason did not qualify for Medicaid benefits. He also certified that after PHP reached "its target occupancy level, [the Foundation] intends to provide a subsidy to PHP to cover any shortfalls arising [from] a resident's inability to pay."

Gurley said none of the residents of the assisted living facilities had applied for financial assistance. PHS had no specific procedures to provide advances by the Foundation to assisted living residents, but the existing policies were "generic." He admitted that residents of the continuing care communities had advanced hundreds of thousands of dollars as entrance fees, and the Foundation had the right to recoup from those fees any monies it had advanced to a resident who had exhausted his or her income.

PHP provides higher staffing levels than typical for-profit facilities. For example, regulations require one nurse be on-site for one eight-hour shift each day, yet PHP maintains three nurses, one for each shift.

Lori High, PHP's marketing director, stated that the only financial criterion for admission was that the resident be able to pay privately for two years. The two-year requirement is based on historical data that shows most people live in an assisted living facility for two years before they die or transfer to a skilled nursing facility.

As an assisted living facility, PHP is required to accept the rate set by Medicaid. But applicants cannot rely on Medicaid as a means to qualify for the income/asset requirement for admission. Under PHS's policy, residents who become qualified for Medicaid are required to move into a shared accommodation, unless a family member or other party agrees to supplement Medicaid's reimbursement.

PHP received a temporary certificate of occupancy to operate Stony Brook as an assisted living residence on January 16, 2002. It received a license, effective February 1, 2002, from the New Jersey Department of Health and Senior Services to operate the property as an assisted living residence.

As of January 31, 2003, forty-two of the ninety-six available assisted living units were occupied. As of December 31, 2003, sixty-two of the units were occupied. By December 31, 2004, seventy units were occupied. Stony Brook's nineteen units for Alzheimer's residents were fully occupied by November 2003.

In opposition to PHP's motion and in support of its motion, Pennington relied on the expert opinion of David L. Stafford, a certified public accountant. Stafford opined that PHP does not actually operate on a not-for-profit basis. He emphasized that the fees and charges were intended to exceed the costs of operation, any surplus could be shifted to the parent organization, it paid management fees commensurate with those of for-profit facilities,

and it was not organized exclusively for hospital purposes. According to Stafford, the contemplated shift of surplus to other PHS activities, including affordable housing facilities, negates the exclusive hospital purposes requirement for tax exemption. Furthermore, the ability of PHS to set its management fee as a percentage of revenue effectively allows the assisted living facility to subsidize other PHS activities, some of which provide no hospital care. Finally, the marketing plan was designed to attract middle income and affluent residents rather than low income residents. Stafford noted PHP's plan included no procedure to retain residents who exhausted their funds. He concluded that PHP failed to address the need to attract financially needy residents, and therefore, failed to fulfill the stated purposes of its bylaws.

In its motion, Pennington also argued that PHP is not organized exclusively for hospital purposes, is not actually and exclusively used for hospital purposes, and was designed to generate a profit. Pennington argued PHP was not actually and exclusively used for hospital purposes because PHP made no provisions to provide for charitable care and provided none.

## II

In a written opinion, the Tax Court judge held PHP was not entitled to claim the exemption for tax year 2002 because the property was not operational on the valuation date, October 1, 2001, of that tax year. *Presbyterian Home at Pennington, Inc. v. Pennington Borough,* 23 *N.J. Tax* 473, 478 (Tax 2007). Furthermore, PHP was not entitled to claim the exemption for tax years 2003 and 2004 because the facility was not operated for hospital purposes within the meaning of *N.J.S.A.* 54:4-3.6. *Ibid.*

In her opinion, the judge examined PHP's exemption claim in accordance with the three criteria set forth in *N.J.S.A.* 54:4-3.6 and *Paper Mill Playhouse v. Millburn Township,* 95 *N.J.* 503, 472 *A.*2d 517 (1984). 23 *N.J. Tax* at 494-513. She found that PHP was organized exclusively for the exempt purpose and its stated

operation was not-for-profit. *Id.* at 503, 513. She found, however, that the property was not actually used for its stated tax exempt purpose. *Id.* at 512.

The judge rejected Pennington's arguments that the language in PHP's certificate of incorporation or the reference to "other activities" in its bylaws defeated PHP's claims. *Id.* at 501, 503. She also rejected Pennington's argument that PHP's ability to make distributions to other charitable organizations defeated the exemption. *Id.* at 504.

The judge also held that the test for nonprofit status was not the size of its fees or the comparability to fees charged by nonprofit and for-profit organizations. Rather, she held that the test was "whether the profits can find their way into anyone's pocket." *Id.* at 512–13.

Although it was undisputed that PHP is an assisted living facility, the judge found that the land and improvements were not actually used for hospital purposes because there was no evidence that it provided charitable care. *Id.* at 511–12. In reaching this decision, the judge noted that the section of the statute amended in 1993 governs tax exemptions to hospitals. *Id.* at 498. She noted that every exemption includes a "quid pro quo" for performance of services that are essentially public. *Ibid.* The quid pro quo for providing exemption from local property taxes for hospitals is the availability of treatment at least at the emergency level to anyone regardless of ability to pay. *Ibid.* Therefore, based on the legislative history and the amendatory language, the judge concluded that nursing homes and assisted living facilities may be eligible for exemption from local property taxes, even if not part of or integrated into a hospital facility, but only if these facilities provide some measure of charitable care. *Id.* at 508–12.

### III

PHP and amici, New Jersey Association of Homes and Services for the Aging and the New Jersey Hospital Association, argue that the Tax Court judge erred when she concluded that PHP's facility

did not qualify for a property tax exemption under *N.J.S.A.* 54:4–3.6 because it was not operated for hospital purposes within the meaning of that statute. They argue that the judge ignored the clear and unambiguous language of the statute and the legislative history of the statute does not support the judge's interpretation. PHP also argues that the judge made inaccurate factual and legal assumptions in reaching her conclusion that to qualify for the hospital purposes tax exemption, nonprofit assisted living facilities were required to provide the same type of quid pro quo charitable care required of hospitals, and PHP failed to do so.

Pennington argues that the judge's decision was correct because the statute is ambiguous, its legislative history supports her decision, and the undisputed facts show that PHP failed to meet its required charitable obligations under the statute. Pennington also argues that the judge erred when she found that PHP's facility met two of the three criteria for the exemption, namely, it was organized exclusively for the purpose for which it claimed exemption and it satisfied the "not-for-profit" test. Amicus New Jersey State League of Municipalities joins these arguments.

All real property in New Jersey is subject to an annual tax unless "expressly" exempt. *N.J.S.A.* 54:4–1. The right to an exemption must be founded within the general laws passed by the Legislature. *N.J. Const.* art. VIII, § 1, ¶ 2; *Twp. of Holmdel v. N.J. Highway Auth.*, 190 *N.J.* 74, 87, 918 *A.*2d 603 (2007).

In *N.J.S.A.* 54:4–3.6, the Legislature established an exemption for the property of nonprofit corporations, including a specific exemption for those involved in "hospital purposes," and enumerates the health care facilities encompassed by this term. The statute provides:

The following property shall be exempt from taxation under this chapter: ... all buildings actually used in the work of associations and corporations organized exclusively for hospital purposes, provided that if any portion of a building used for hospital purposes is leased to profit-making organizations or otherwise used for purposes which are not themselves exempt from taxation, that portion shall be subject to taxation and the remaining portion only shall be exempt; ... provided, in case of all the foregoing, the buildings, or the lands on which they stand, or the

associations, corporations or institutions using and occupying them as aforesaid, are not conducted for profit. . . .

As used in this section "hospital purposes" includes health care facilities for the elderly, such as nursing homes; residential health care facilities; *assisted living residences;* facilities with a Class C license . . . similar facilities that provide medical, nursing or personal care services to their residents; and that portion of the central administrative or service facility of a continuing care retirement community that is reasonably allocable as a health care facility for the elderly.

[*N.J.S.A.* 54:4–3.6 (emphasis added).]

The paragraph that elucidates "hospital purposes" was added by *L.* 1993, *c.* 166, § 1.

In *Paper Mill Playhouse, supra,* 95 *N.J.* at 506, 472 *A.*2d 517, the Supreme Court identified three criteria necessary for a non-profit corporation to secure an exemption under *N.J.S.A.* 54:4–3.6. Applying the provision of *N.J.S.A.* 54:4–3.6 that pertains to non-profit corporations organized for the moral and mental improvement of men, women, and children, the Court held the corporation that owns the property: "(1) . . . must be organized exclusively for the moral and mental improvement of men, women and children; (2) its property must be actually and exclusively used for the tax-exempt purpose; and (3) its operation and use of its property must not be conducted for profit." *Ibid.*

A subsequent version of the statute amended the "actual and exclusive use" provision of the second criterion to its current language to clarify exemption eligibility where portions of the building are not used for the exempt purpose. *Hunterdon Med. Ctr. v. Twp. of Readington,* 195 *N.J.* 549, 561 n. 9, 951 *A.*2d 931 (2008); *Planned Parenthood of Bergen County, Inc. v. Hackensack,* 12 *N.J. Tax* 598, 606–09 (Tax 1992), *aff'd,* 14 *N.J. Tax* 171 (App.Div.1993). The Supreme Court recently affirmed the general application of these criteria to the determination of an exemption for hospital purposes under *N.J.S.A.* 54:4–3.6. *Hunterdon Med. Ctr., supra,* 195 *N.J.* at 561, 951 *A.*2d 931.

Here, the judge concluded that PHP failed to meet the second criterion, because "Stony Brook is not operated for the charitable and hospital purposes envisioned by its organizational

documents, or for the 'hospital purposes' contemplated by *N.J.S.A.* 54:4-3.6." *Presbyterian Home, supra,* 23 *N.J. Tax* at 512. Generally, appellate courts apply a highly deferential standard of review when considering the factual findings and decisions of Tax Court judges. *Brown v. Borough of Glen Rock,* 19 *N.J. Tax* 366, 375 (App.Div.), *certif. denied,* 168 *N.J.* 291, 773 *A.*2d 1155 (2001). The " 'special qualifications, knowledge and experience in matters of taxation' " of Tax Court judges entitles them to deference "in matters directly involving such expertise." *Miele v. Twp. of Jackson,* 11 *N.J. Tax* 97, 100 (App.Div.1989) (quoting *N.J.S.A.* 2A:3A-13). The findings of the Tax Court will not be disturbed "unless they are plainly arbitrary or there is a lack of substantial evidence to support them." *G & S Co. v. Borough of Eatontown,* 6 *N.J. Tax* 218, 220 (App.Div.1982).

However, in this case, the judge's finding rested entirely on her interpretation of the term "hospital purposes" in the statute. A tax court's interpretation of a statute is reviewed de novo. *'Holmdel, supra,* 190 *N.J.* at 86, 918 *A.*2d 603. The meaning of a tax statute must be discerned according to the general rules of statutory construction. *Oberhand v. Dir., Div. of Taxation,* 193 *N.J.* 558, 568, 940 *A.*2d 1202 (2008). The court must first examine the statute's plain language. *Ibid.* If the language is clear, the court interprets the statute consistent with its plain meaning. *Ibid.* If the language is unclear, however, the court will then review the statute's legislative history as a means to determine the legislative intent. *Ibid.* Where the ordinary language in a statute demonstrates the Legislature's clear intent, the court's duty is to apply that plain meaning. *Jablonowska v. Suther,* 195 *N.J.* 91, 105, 948 *A.*2d 610 (2008); *DiProspero v. Penn,* 183 *N.J.* 477, 491, 874 *A.*2d 1039 (2005). Indeed, in *DiProspero, supra,* the Court admonished the trial court and this court for engrafting a substantial injury requirement in verbal threshold cases contrary to the plain language of the recent amendment to the New Jersey Automobile Reparation Reform Act ("No Fault Act"), *N.J.S.A.* 39:6A-1 to -35. 183 *N.J.* at 481-82, 874 *A.*2d 1039.

■ The plain language of *N.J.S.A.* 54:4–3.6 includes assisted living facilities within its definition of hospital purposes that are exempt from taxation. It is undisputed that PHP operates an assisted living facility. The statute was amended to include assisted living facilities within the hospital purposes exemption shortly after two decisions denied exemptions to a nursing home and a long-term care facility.

In *Intercare Health Systems, Inc. v. Cedar Grove Township,* 11 *N.J. Tax* 423, 428–30 (Tax 1990), *aff'd o.b.,* 12 *N.J. Tax* 273 (App.Div.1991), *certif. denied,* 127 *N.J.* 558, 606 *A.*2d 369 (1992), a nonprofit corporation operating a long-term care facility with a skilled nursing facility and nursing home sought property tax exemption under the hospital purposes exemption, either on the basis of its own operation or its status as part of a larger entity that operated hospitals. The Tax Court found that the corporation was not entitled to an exemption in either case, because it neither provided the acute care required of hospitals nor was fully integrated into the functions of an authorized operating hospital. *Id.* at 430–32, 606 *A.*2d 369.

In *Woodstown Borough v. Friends Home at Woodstown,* 12 *N.J. Tax* 197, 199–201 (Tax 1992), a nonprofit corporation operated a continuing care retirement home with a skilled nursing facility and a separate home for the elderly. It sought property tax exemption for the continuing care facility on the basis of either the hospital purposes exemption or the charitable purposes exemption, *id.* at 200, but the Tax Court found neither applicable, *id.* at 205, 213.

Relying on the holding in *Intercare,* the *Woodstown* court held that the long-term care facility was unable to claim the hospital purposes exemption because it was not integrated into a hospital. *Id.* at 204. Regarding the corporation's claim for a charitable purposes exemption, the Tax Court examined whether the buildings for which the corporation claimed an exemption were "actually and exclusively used for charitable purposes." *Id.* at 205. Although the nursing facility accepted private-pay and Medicaid

patients, an individual would not be admitted to the facility unless he or she could demonstrate an ability to pay the fees. *Id.* at 206. The facility's director claimed that no one would be asked to leave if he or she became unable to pay, but neither the corporation's bylaws nor its charter obligated the corporation to follow this policy. *Id.* at 210.

The *Woodstown* court recognized that the facility was owned by a nonprofit corporation, that none of its income or profits inured to the benefit of any individual, and that members of the corporation's board and the surrounding community donated many volunteer hours to the facility. *Id.* at 208. But its nonprofit status was only one factor in the determination of whether the property was being used for charitable purposes. *Id.* at 208–09.

The corporation's net income, in excess of $100,000 from operations and investments for the period from 1981 to 1989, exclusive of 1988, "resulted in a fair amount of profit" to the corporation. *Id.* at 210. Although charging fees did not necessarily deny a charitable purpose, "the amount of fees charged, the income received, the small percentage of charitable contributions, and the failure to actively seek the admission of below-average income or indigent patients negates a charitable purpose." *Ibid.* "The mere fact that these residents are senior citizens enjoying alleged low rentals and social, and possible nursing, services does not elevate these facts to 'charitable purposes.'" *Id.* at 213.

*Woodstown* was decided on January 24, 1992, the same day that the Supreme Court denied certification in *Intercare Health Systems, supra,* 127 *N.J.* 558, 606 *A.*2d 369. The amendment defining the meaning of hospital purposes within *N.J.S.A.* 54:4–3.6 and including within that definition "health care facilities for the elderly" was introduced on November 23, 1992.

The Assembly Statement to the bill reads as follows:

This bill provides property tax exempt status for non-profit health care properties for the elderly.

According to the sponsor most non-profit health care facilities for the elderly are exempt from property tax under one of the provisions of the exemption law on non-

profit organizations. However, there is no explicit exemption for non-profit health care facilities for the elderly. To protect their status, and to clarify the basis for their exemption, this bill amends the current exemption law on nonprofit organizations so that the term "hospital purposes" includes health care facilities for the elderly, such as nursing homes; residential health care facilities; assisted living residences; facilities with a Class C license; ... similar facilities that provide medical, nursing or personal care services to their residents; and that portion of the central administrative or service facility of a continuing care retirement community that is reasonably allocable as a health care facility for the elderly.[1]

The news release issued by Governor Florio's office upon the bill's enactment states:

> The new law closes a loophole in the state's property tax code which granted property exempt status to non-profit health care facilities organized for religious, charitable or hospital purposes. While some towns may have exempted health care facilities for the elderly under one of the existing exemptions, no *explicit* exclusion for such facilities existed.
>
> In New Jersey, about one-quarter of the elderly health care facilities are non-profit. The new law ensures that non-profit hospitals, religious homes and residential health care facilities will all be treated the same way with the same rules. It also means that non-profits can hold their costs down because they'll be better able to predict their costs and plan for the long term. Keeping health care costs down for seniors will help put the brakes on insurance premiums for everyone....

We discern no reason to look beyond the plain words of the statute, and even less support in the legislative history for the conclusions reached by the Tax Court judge. Only if the language of a statute is silent or ambiguous, or if it is plain but ambiguous with respect to the "how the Legislature intended the statute to apply in particular circumstances," should a court look to the statute's legislative history or other extrinsic evidence to discern the intended meaning behind the Legislature's chosen words. *Jablonowska, supra,* 195 *N.J.* at 105, 948 *A.*2d 610; *Middletown Twp. PBA Local 124 v. Twp. of Middletown,* 193 *N.J.* 1, 12, 935 *A.*2d 516 (2007).

---

[1] The judge here cited a version of the statement that appeared with the introduction of the bill. Different iterations of the statement were submitted by different Assembly committees, but the one quoted by the Tax Court also was included in the final version of the bill as submitted by plaintiff's amici in their appendix.

There was no basis here for a judicial attempt to discern the Legislature's intent in placing assisted living facilities within the hospital purposes exemption. The judge identified no ambiguity in the language. Nor was there any ambiguity in the application of the statute to the circumstances of this facility. There was no dispute that Stony Brook was an assisted living facility, and the judge determined that PHP was organized exclusively for the identified tax exempt purpose and that it was a nonprofit corporation.

The legislative history provides no basis for the imposition of a requirement that assisted living facilities provide charitable care to become eligible for the property tax exemption afforded by *N.J.S.A.* 54:4–3.6. The purpose of the bill was to provide an "explicit exemption for non-profit health care facilities for the elderly." As the Governor's Office recognized, it was already possible for some facilities to obtain exemptions for charitable, religious, or hospital uses. The purpose of the bill was to provide an exemption for these uses regardless of whether the entity fell within the other categories of exemption.

The holding in *Presbyterian Homes of the Synod of New Jersey v. Division of Tax Appeals,* 55 *N.J.* 275, 261 *A.*2d 143 (1970), upon which the judge also relied, is inapplicable for the same reasons. There, the plaintiff sought tax exemption under the charitable purposes exemption for a retirement community with its own health center. *Id.* at 278–79, 261 *A.*2d 143. The Court rejected the plaintiff's contention that "the care of the aged, of whatever financial ability, is *per se* an exempt activity." *Id.* at 283, 261 *A.*2d 143.

In relying on *Presbyterian Homes of the Synod,* the judge here ignored the fact that the charitable purposes exemption and the hospital purposes exemption provide two entirely different bases for an exemption and, moreover, that *Presbyterian Homes of the Synod* was decided decades before the current version of the hospital purposes exemption was instituted. Both the reasoning and the holding of that case are inapplicable here.

Reliance on *N.J.S.A.* 26:2H–18.64 is also misplaced. This statute provides: "No hospital shall deny any admission or appropriate service to a patient on the basis of that patient's ability to pay or source of payment." To address these unreimbursed costs, hospitals receive a substantial subsidy from the State to provide charitable care. *See N.J.S.A.* 26:2H–18.59 to –18.69. None of these statutes make any reference to assisted living facilities, and there is no claim that such facilities would be entitled to similar reimbursement by the State. The availability of reimbursement for charitable care significantly undercuts the "quid pro quo" exemption rationale identified by the Tax Court judge.

Moreover, the statutory obligation for hospitals to provide charitable care did not exist until the 1993 enactment of *L.* 1992, *c.* 160, § 14. The hospital purposes exemption has been in place since the early 1900s, having been included in the original statute that exempted certain classes of property from taxes. *L.* 1918, *c.* 236, § 203.

A court "ought not 'rewrite a plainly-written enactment of the Legislature.' " *Jablonowska, supra,* 195 *N.J.* at 105, 948 *A.*2d 610 (quoting *DiProspero, supra,* 183 *N.J.* at 492, 874 *A.*2d 1039). Nor should it presume the Legislature intended something other than the meaning of the plain language. *Ibid.* Most especially, it is not the function of a court to insert " 'an additional qualification which the Legislature pointedly omitted in drafting its own enactment.' " *Saunders ex rel. Saunders v. Capital Health Sys. at Mercer,* 398 *N.J.Super.* 500, 508, 942 *A.*2d 142 (App.Div.2008) (quoting *Craster v. Bd. of Comm'rs of Newark,* 9 *N.J.* 225, 230, 87 *A.*2d 721 (1952)).

Yet, that is what the Tax Court judge did here. There was no basis in either the plain language of the statute or its legislative history to impose an additional charitable care component upon an assisted living facility for it to qualify for tax exemption under the hospital purposes provision of *N.J.S.A.* 54:4–3.6. The judge's finding that PHP failed to meet the second *Paper Mill Playhouse* criterion was erroneous.

Pennington also argues that PHP is not entitled to an exemption because it also failed to meet the first and third criteria. It contends that, in determining otherwise, the judge misapplied established law to the facts. This argument is without merit.

IV

Pennington argues that the exemption provision of *N.J.S.A.* 54:4–3.6 for assisted living facilities is unconstitutional here because it violates the Uniformity Clause of the New Jersey Constitution when applied to "assisted living facilities that serve well-to-do seniors," and does not fall within the parameters of the Exemption Clause. We disagree.

The New Jersey Constitution contains the following mandate:

Property shall be assessed for taxation under general laws and by uniform rules. All real property assessed and taxed locally or by the State for allotment and payment to taxing districts shall be assessed according to the same standard of value, except as otherwise permitted herein, and such real property shall be taxed at the general tax rate of the taxing district in which the property is situated, for the use of such taxing district

[*N.J. Const.* art. VIII, § 1, ¶ 1(a).]

This provision is known as the Uniformity Clause. *Chadwick 99 Assocs. v. Dir., Div. of Taxation*, 23 *N.J. Tax* 390, 411–12 (Tax 2007).

However, in addition, Article VIII, Section I, Paragraph 2 of the Exemption Clause provides:

Exemption from taxation may be granted only by general laws. Until otherwise provided by law all exemptions from taxation validly granted and now in existence shall be continued. Exemptions from taxation may be altered or repealed, except those exempting real and personal property used exclusively for religious, educational, charitable or cemetery purposes, as defined by law, and owned by any corporation or association organized and conducted exclusively for one or more of such purposes and not operating for profit.

The Uniformity Clause was included in the 1947 New Jersey Constitution as a reaction to the preferential tax treatment of real property afforded to the railroad industry by statute and judicial decision. *N.J. State League of Municipalities v. Kimmelman*, 105 *N.J.* 422, 431, 522 *A.*2d 430 (1987). The Court explained that,

in light of the restraint imposed by the Uniformity Clause, the Exemption Clause was intended to retain the Legislature's power to grant exemptions "in the historical mold of the public purpose-then seen primarily as educational, charitable, and religious purposes." *Id.* at 435, 522 *A.*2d 430.

Pennington argues that much like the tax preferences for railroads and other commercial interests that led to the adoption of the Uniformity Clause, the tax exemption for assisted living facilities in *N.J.S.A.* 54:4–3.6 violates the Uniformity Clause as applied to PHP. It contends that the exemption sought by PHP "singles out a particular industry and use for favorable tax treatment with the result that all other taxpayers, including senior citizens who hope to stay in their own homes, bear a correspondingly higher tax burden."

Pennington further contends "that a constitutionally sufficient tax exempt public purpose must fall within the historic charitable, religious, or educational framework or, if not, must" meet a three-part test set forth in *Town of Morristown v. Woman's Club of Morristown,* 124 *N.J.* 605, 592 *A.*2d 216 (1991). Pennington argues that PHP's provision of market-rate services to "a select population of relatively affluent seniors" who are sixty-five or older "and thus can be called 'elderly' does not transform its work into charitable work or establish that it serves a cognizable tax exempt public purpose" that is recognized by the Exemption Clause. In addition, according to Pennington, Stony Brook's assisted living residence fails to meet the three-part "public purpose" test of *Morristown.*

It is unnecessary for PHP to establish that its assisted living facility meets the three-part test because there is no merit to Pennington's argument that PHP's nonprofit assisted living facility is not cognizable under the Exemption Clause. Pennington fails to acknowledge that the framers of the 1947 Constitution clearly understood hospital purposes to be part of the charitable, religious, and educational tradition encompassed within the brief language of the Exemption Clause.

An exemption for hospital purposes was included in the original exemption law of 1918, which stated, in part, that the exemption applied to "all buildings actually and exclusively used in the work of associations and corporations organized exclusively for the moral and mental improvement of men, women or children, *or for* religious, charitable or *hospital purposes." L.* 1918, *c.* 236, § 203, ¶ (4) (emphasis added). Clearly, from the statute's inception its exemption provisions recognized that hospital purposes were distinguishable from charitable ones and countenanced the value of each as worthy of exemption from taxation.

Moreover, the 1941 version of the exemption statute, in effect at the time the framers created the 1947 Constitution, exempted buildings used for: educational purposes; historical societies when owned by the State or a political subdivision; public libraries; asylums or schools for "the feeble-minded or idiotic"; the prevention of cruelty to animals; volunteer first aid squads; moral and mental improvement; "religious, charitable or *hospital purposes* "; and certain parsonages. *L.* 1941, *c.* 243, § 1 (emphasis added). The statute specified that the exemption applied

provided, in the case of all the foregoing, the buildings or the lands on which they stand, or the associations, corporations or institution using and occupying them as aforesaid, are not conducted for profit, except that the exemptions of the buildings and lands used for charitable, benevolent or religious purposes *shall extend to cases where the charitable, benevolent or religious work therein carried on is supported partly by fees and charges received from or on behalf of beneficiaries using or occupying the building; provided, the building is wholly controlled by and the entire income therefrom is used for said charitable, benevolent or religious purposes.*

[*Ibid.* (emphasis added).]

The types of exemptions recognized by the Legislature at the time of the 1947 Constitution did not require that they provide their services on a charitable basis. It merely required that providers recognized as worthy of exemption not be operated for a profit.

This version of the statute was in full force and effect when the 1947 Constitution was adopted. No part of it was repealed by the Constitution, which provided that, "All law, statutory and other-

wise, all rules and regulations of administrative bodies and all rules of courts in force at the time this Constitution or any Article thereof takes effect shall remain in full force until they expire or are superseded, altered or repealed by this Constitution or otherwise." *N.J. Const.* art. XI, § I, ¶ 3. The hospital purposes provision of the original source statute has never been repealed, only altered to define what types of facilities are to be considered as hospital purposes. But the passage of that amendment is in keeping with the recognition that the role of medicine has expanded far beyond that contemplated by the legislators who passed the original 1918 source statute. Contrary to Pennington's argument, it does not extend the statute to an entire industry unforeseen by the framers. The "industry" of for-profit healthcare facilities, whether hospitals or assisted living residences, remains unprotected under the Exemption Clause and the statute.

### V

PHP argues that the judge's decision to grant summary judgment to Pennington and deny PHP's exemption for the 2002 tax year was erroneous because the judge improperly resolved disputed issues of fact in rejecting PHP's estoppel claim. We disagree.

The judge correctly determined that the disputed issues of fact related to PHP's estoppel claims were irrelevant. The power to grant a statutorily authorized exemption from property taxation is afforded to the municipal tax assessor by *N.J.S.A.* 54:4-4.4. *W. Milford Twp. v. Garfield Recreation Comm., Inc.,* 194 *N.J.Super.* 148, 155–56, 476 *A.*2d 333 (Law Div.1983). Promises made by municipal officials with no authority to grant an exemption cannot serve as the basis for an estoppel claim with respect to the payment of taxes. *Black Whale, Inc. v. Dir., Div. of Taxation,* 15 *N.J. Tax* 338, 354 (Tax 1995). "Collection of taxes is a governmental function in the performance of which a city may not be bound or estopped by unauthorized acts of its officers." *City of Bayonne v. Murphy & Perrett Co.,* 7 *N.J.* 298, 311, 81 *A.*2d 485 (1951). The factual dispute of whether Pennington's attorney

or its administrator made any promise of exemption to PHP has no bearing on the issue of whether PHP was entitled to claim an exemption for the 2002 tax year.

On the other hand, the judge erred when she allowed Pennington to assess PHP's facility as though it were substantially complete and operational on October 1, 2001, while denying its tax exempt status for both the land and improvements on the basis that it was not operational. There is no question that PHP's property had not been entitled to tax exempt status while owned by the previous developer. Nor is there any question that Stony Brook accepted its first residents in February 2002. But the judge failed to examine the law applicable to buildings that are under development, made no findings as to whether the building was substantially completed on October 1, 2001, and cited numerous cases that are readily distinguishable.

Under *N.J.S.A.* 54:4–63.3 (emphasis added),

> [W]hen any parcel of real property contains any building or other structure which has been erected, added to or improved after October 1 and *completed* between January 1 and October 1 following, the assessor shall, after examination and inquiry, determine the taxable value of such parcel of real property as of the first of the month following the date ... of such completion, and if such property was not assessed as of October 1 preceding or, if such value so determined exceeds the assessment made as of October 1 preceding, the assessor shall enter an assessment, as an added assessment against such parcel of real property, in the "Added Assessment List, 19 ...," which assessment shall be determined as follows: by multiplying the amount of such assessment or such excess by the number of whole months remaining in the calendar year after the date of delivery of such deed, or of such completion, and dividing the result by 12.

*N.J.S.A.* 54:4–63.2 applies similarly to the valuation of real property where the structures or improvements are "erected, added to or improved after October 1 in any year and completed before January 1 the following" year. *N.J.S.A.* 54:4–63.1 defines "completed" for the purposes of *N.J.S.A.* 54:4–63.2 and –63.3 as "substantially ready for the use for which it was intended."

In *Schizophrenia Foundation of New Jersey v. Township of Montgomery*, 6 *N.J. Tax* 439, 441–43 (App.Div.1984), this court considered the interaction between this statute and the determina-

tion of tax exempt status. The plaintiff was a nonprofit corporation organized to operate an educational and research facility to assist those who suffered from schizophrenia. *Schizophrenia Found. of N.J. v. Montgomery Twp.*, 4 *N.J. Tax* 662, 663 (Tax 1982), *rev'd*, 6 *N.J. Tax* at 444. It owned two lots in Montgomery Township that had been assessed as unimproved farmland. *Ibid.*

In the summer of 1980, the plaintiff began construction of an office building and research facility on one of the lots. *Id.* at 663–64. On October 21, 1980, it applied for a tax exemption for 1981 based on the improvements. *Id.* at 664. The tax assessor denied the application on the basis that "the properties were not 'actually and exclusively used for ... purposes which would support a tax exemption.'" *Ibid.* On May 26, 1981, the plaintiff began to occupy and use its new building. *Ibid.*

In September 1981, the defendant notified the plaintiff of an added assessment for the improvement for the seven-month period of June through December 1981. *Ibid.* The plaintiff appealed the added assessment to the county board on the basis of its tax exempt use of the building. *Ibid.* But the board concluded that the plaintiff was ineligible for the exemption for the 1981 assessment because it was not using the building for exempt purposes on October 1, 1980. *Ibid.*

The plaintiff filed a complaint in the Tax Court alleging "that tax-exempt status for new construction should be determined as of the date of an added assessment rather than as of the traditional assessing date of October 1 of the pretax year." *Id.* at 665. The Tax Court rejected that argument, holding "as a matter of law that October 1 of the pretax year is the date as of which qualification for property tax exemption is to be determined for new construction which becomes subject to an added assessment subsequent to that October 1 date." *Id.* at 669.

We reversed, holding "the tax status of a property subject to an added assessment should be ascertained as of the date of the assessment." *Schizophrenia Found., supra,* 6 *N.J. Tax* at 442. The land could not be tax exempt for 1981, because those assess-

ments were made on October 1, 1980. *Id.* at 443. We observed that under the Tax Court's holding "it would be impossible for a structure on an added assessment list to become exempt for the year in which it was completed, at least in the absence of some other specific overriding law." *Ibid.* "We have difficulty in believing that the Legislature intended to tax structures such as churches which have been completed and used for exempt purposes after the original assessment date." *Ibid.*

In this case, the judge applied the October 1 assessment date but made no finding as to whether the building was substantially completed on that date. Pennington had assessed the property for the full value of the improvements on October 1, 2001, assessing PHP's property at $1,042,800 for the value of the land and $8,286,200 for the improvements. However, if the property was not ready for its intended use until February 2002, then that was the proper assessment date for valuation of the improvements, as was held in *Schizophrenia Foundation.* None of the law cited by the judge supports her decision to assess the full value of the improvements on the October 1 assessment date that a property actually was owned by the tax exempt entity, but then deny an otherwise valid exemption on the basis that the improvements were not actually being used.

The record here is unclear as to Stony Brook's level of completion on October 1, 2001. If it was substantially completed on October 1, then PHP was entitled to a tax exemption for the full amount of the value. If, as in *Schizophrenia Foundation,* the facility could not be considered substantially complete until February 2002, then the land should have been taxed as non-exempt for 2002, but the improvements valued as of the first day of the month following completion and, at that point, accorded tax exempt status.

Therefore, the order denying PHP's tax exemption for tax year 2002 is reversed and remanded for a determination of when PHP's facility was substantially completed. The orders denying PHP's tax exemption for tax years 2003 and 2004 are reversed.

Reversed and remanded for further proceedings consistent with this opinion.