LARIO, J.T.C.
At issue in both of these appeals, which have been consolidated for trial, is whether the subject land, and three buildings located thereon, are entitled to tax exemption.
The land consists of a single parcel totalling 4.6 acres. Legal title thereto was taken in the name of “Friends Boarding Home of Salem Quarterly Meeting,” a non-profit corporation, which subsequently changed its name to "Friends Home at Woods-town” (Friends Home). Located on the majority of the tract is a one-story building with several wings owned by Friends Home and operated by it as a long-term care facility.
Woods Court, also a non-profit corporation, was established in 1981 as a counterpart to, and is operated in conjunction with, Friends Home. Both organizations are sponsored by the Religious Society of Friends of the Salem Quarterly Meeting.
In 1981, Friends Home entered into a 99-year lease with Woods Court leasing to it a portion of the land at $1 a year. The lease does not specify the exact portion of the land leased, however, pretrial briefs of Friends Home and Woods Court allocated 2.93 acres to Friends Home and 1.67 acres to Woods Court. Woods Court constructed, on the leased portion, two residential buildings containing private rooms which it subleases to aged or infirmed persons.
The long-term care facility is listed on the borough’s tax map as Block 27, Lot 64 and is assessed to Friends Home. The land upon which the two residential buildings owned by Woods Court are located are identified for tax assessment purposes as Block 27, Lot 64.01. The improvements owned by Woods Court, consisting of the two residential dwellings, are assessed to Woods Court under Block 27, Lot 64.01, however, the land *200 upon which these two buildings are located is not separately assessed; instead, the full 4.6 acres has a single land assessment totally assigned to Lot 64 and billed solely to Friends Home.
For the year 1989, the borough assessed Lot 64 at land (which included the total 4.6 acres)—$35,100, improvements— $903,400, for a total of $938,500 which it billed to Friends Home. It assessed Lot 64.01 at Land $-0-, Improvements at $230,000, total—$230,000 which it billed to Woods Court. Both organizations appealed their respective assessments to the Salem County Board of Taxation. The board entered a judgment exempting the land and improvement assessments on Lot 64 (the total 4.6 acres and the long-term care facility owned by Friends Home) and affirmed the improvement assessment for Lot 64.01 (Woods Court’s residential buildings). As a result of the county board’s determination, although the improvements owned by Woods Court were deemed taxable, the land upon which those improvements are located was exempt. Woods Court appealed the denial of exemption for its improvements on Lot 64.01 and the Borough of Woodstown appealed the granting of an exemption to Friends Home for both its improvements and the total 4.6 acres assigned to Lot 64.
Friends Home claims it is entitled to tax exemption pursuant to N.J.S.A. 54:4-3.6, alleging it was organized exclusively for both charitable and hospital purposes and its building is operated exclusively for charitable and hospital purposes. Woods Court claims it qualifies for exemption from taxation also under N.J.S.A. 54:4-3.6 because it is organized and used exclusively for charitable purposes. Woodstown concedes that both organizations are non-profit corporations but denies that the buildings are exclusively used for either hospital purposes or charitable purposes. It further contends that if Woods Court is not exempt, the lands apportioned to it may not be exempted. The pertinent portions of N.J.S.A. 54:4-3.6 upon which the “hospital purposes” claim is based exempts from taxation:
... all buildings actually used in the work of associations and corporations organized exclusively for hospital purposes, provided that if any portion of a *201 building used for hospital purposes is leased to profit making organizations or otherwise used for purposes which are not themselves exempt from taxation, that portion shall be subject to taxation and the remaining portion only shall be exempt.
Friends Boarding Home of Salem Quarterly Meeting was originally incorporated in 1887. Its articles of incorporation certify that its object was “to provide a residence for aged and infirmad Friends, and those in sympathy with Friends, where, at a moderate cost, they can have needful comforts.” When its name was changed in 1974, no amendment was made to its certified purposes.
Friends Home is governed by a 16-member board of trustees who serve without compensation. The corporation is licensed by the State of New Jersey to operate a long-term care facility pursuant to N.J.A.C. 8:39-1.1 et seq. It also has a second license issued by the Department of Health for its residential portion. Its facility is a large one-story building divided in two sections. One section, known as the residential care section, contains four separate wings having a total of 60 spaces for residents who do not need skilled nursing care. On the opposite side of the nursing home there are one- and a-half wings which contain space for 60 patients requiring skilled nursing care. This portion of the facility is known as the nursing care section.
The nursing care section is staffed by a medical director, a director of nursing, an assistant director of nursing, ten registered nurses, eight licensed practical nurses and 42 nurse’s aids. Twenty-four hour care is provided by the registered nurses or the licensed practical nurses.
Although all of the residents and patients in both sections require medical assistance and care, those in the residential portion require less intensive care than those in the nursing section. Those persons in the residential section are provided care by a staff consisting of a registered nurse certified in gerontology and four nurses aids who monitor their health and medical needs and aid in their daily living activities. The *202 nursing section’s director of nursing also supervises this nursing staff.
Patients are admitted to the nursing section only if they require it according to a written order of a licensed physician. They usually suffer from the following: diseases of the circulatory, nervous and respiratory systems, cardiac diseases, Alzheimer’s, strokes, brain injuries, diabetes and mental disorders. The care provided these patients includes bathing, assistance with dressing, oral hygiene, feeding, assistance with walking, incontinent care, medications and treatments. In addition, urinary catheter, tracheostomies and feeding tubes are administered and maintained, and respiratory therapy and other rehabilitative therapies are performed, including occupational therapy, physical therapy and social rehabilitation. Drawing of blood and other laboratory work is also conducted. There was no evidence introduced that this long-term facility has accepted or is equipped to receive patients requiring emergency treatment nor does it provide out-patient treatment, major surgical or obstetrical services and care.
There is no dispute that Friends Home owns the land supporting the nursing facility; therefore, to be determined is whether the corporation is organized exclusively for hospital purposes and whether the building is actually used for hospital purposes; a two-prong requirement. Friends Home claims it qualifies for the exemption because it is organized exclusively for hospital purposes; and, because no person can be admitted to its nursing facility without a written order of a licensed physician, and upon admission, 24-hour nursing and hospital-type care is provided.
It is the well established general rule relative to the interpretation of property tax exemption statutes that, since exemption from taxation is a departure from the equitable principle that everyone should bear his just and equal share of the public burden of taxation, such exceptions are to be strictly construed, Princeton Univ. Press v. Princeton 35 N.J. 209, 214, 172 A.2d 420 (1961), and doubts are to be resolved against *203 the one claiming the exemption. Bloomfield v. Academy of Medicine of New Jersey, 47 N.J. 358, 363, 221 A.2d 15 (1966). The claimant who asserts a tax exemption has the burden of proof to clearly bring itself within the tax exemption provisions. Long Branch v. Monmouh Medical Center, 138 N.J.Super. 524, 531, 351 A.2d 756 (App.Div.1976), aff'd o.b., 73 N.J. 179, 373 A.2d 651 (1977); Jamouneau v. Tax App.Div., 2 N.J. 325, 330, 66 A.2d 534 (1949). This burden remains on claimant even when the county board has granted exemption and the appeal is by the municipality. “The burden of proof is upon him who asserts a tax exemption to establish the asserted right.” Ibid.; New Brunswick v. Rutgers Community Health Plan, Inc., 7 N.J.Tax, 491, 495 (Tax Ct.1985); Weymouth Tp. v. Memorial Pk. Fam. Prac. Ctr., Inc. 7 N.J.Tax 589, 592-595 (Tax Ct.1985).
There is no statutory definition of “hospital purposes”, however, recently the construction of this term was thoroughly analyzed by this court in New Brunswick v. Rutgers Community Health Plan, Inc., supra, wherein Judge Andrew stated:
The facility for which exemption is sought must exist for hospital purposes. Its purposes are ‘hospital purposes’ if its services are performed for the purpose of advancing the aims and goals of a functioning hospital. The term ‘hospital’ in § 3.6, which is the operative word, is an adjective that modifies and qualifies the purpose which the facility seeking exemption must serve to obtain exempt status. Section 3.6 does not exempt any facility which provides hospital-type services; rather it exempts facilities whose services are provided to advance the functioning of a hospital, whether or not the services are medical care or health care in nature.
There are many purposes that may constitute hospital purposes when performed in conjunction with the functioning of a hospital. These will lose their qualifying status when disassociated with a hospital and performed independently and not for the purpose of accomplishing the objectives of a hospital. For example, hospitals require laundry services, accounting services, parking facilities, and residential housing facilities for personnel. The facilities serving these purposes all exist for hospital purposes to the extent that they are an integral part of, and are reasonably necessary for the proper and efficient operation of the hospital facility. Long Branch, supra, 138 N.J.Super. at 535, 351 A.2d 756; [City of] Summit [v. Overlook Hospital Ass'n], supra, 4 N.J.Tax [183] at 193 [ (Tax Ct.1982) ]. Similarly, even when the function of the facility involved is to provide hospital-type medical or health care services, the facility cannot exist for hospital purposes unless its services are reasonably necessary to, and thereby fulfill the purposes of, a hospital.
*204 The sheer fact that a hospital provides a particular service does not make any facility which provides that same service exist for hospital purposes unless that facility provides the service for the benefit of a hospital [7 NJ.Tax at 505-506].
In Intercare Health Systems, Inc./Hartwyck West, Inc. v. Cedar Grove Tp., 11 N.J.Tax 423 (Tax Ct.1990), aff’d, 12 N.J.Tax 273 (App.Div.1991), certif. den., —N.J.-,—A.2d-(1992), this court denied a tax exemption as a “hospital” to a nursing home licensed as a long-term care facility because it did not provide acute care and further held it was not used for “hospital purposes” because the operation was not an integral part of a functioning hospital. The Appellate Division affirmed stating: “The undisputed facts of this case establish that Hartwyck and Intercare failed to meet that prerequisite for a tax exemption. The building for which they sought a tax exemption is not an integral part of a functioning hospital.” 12 N.J.Tax at 274-275.
The building owned by Friends Home is used as both a nursing care facility and a residential unit. The director of nursing acknowledged that the facility is not a hospital. Friends Home provides some type of health care similar to those which a hospital would normally provide, however, “it does not provide this care for the purposes of furthering the goal of a hospital.” New Brunswick v. Rutgers Community Health Plan, Inc., supra, 7 N.J.Tax at 506, nor is it “an integral part of a functioning hospital.” Intercare Health Systems, supra, 12 N.J.Tax at 275. Its hospitalization functions are merely incidental to its main function of a nursing care facility. Presbyterian Homes v. Tax App.Div. 55 N.J. 275, 289, 261 A.2d 143 (1970).
The purposes for which Friends Home has been incorporated, as set forth in its certification of incorporation are simply and clearly stated: “[T]o provide a residence for aged and infirm Friends ... where ... they can have needful comforts.” It is noted that at the time this purpose clause was promulgated, the name of the organization was “Friends’ Boarding Home of Salem Quarterly Meeting.” Emphasis supplied. Therefore, the intent of the purpose clause should be interpreted with consid *205 eration given to this name. I equate the intent of “residence” as used in this clause as a boarding-home type of establishment and not as a “hospital” or “hospital purposes” building.
I conclude that Friends Home was neither organized exclusively for hospital purposes nor was its building actually used for hospital purposes. Therefore, Friends Home is not entitled to a “hospital purposes” exemption.
Next to be considered is whether the property of either owner is entitled to a “charitable purposes” exemption. The pertinent portion of N.J.S.A. 54:4-3.6 applicable to this issue states:
The following property shall be exempt from tax under this chapter: ... All buildings actually and exclusively used in the work of associations and corporations organized exclusively for ... charitable purposes____
The foregoing exemption shall apply only where the association, corporation or institution claiming the exemption owns the property in question and is ... authorized to carry out the purposes on account of which the exemption is claimed____
Under this portion of the statute, to be exempted from taxation a claimant is required to establish that the buildings for which exemption is sought are actually and exclusively used for charitable purposes. “Under the statute, exemption from taxation is tested by exclusiveness both of purpose of the organization and of use of the property____” Princeton University Press v. Princeton, supra, 35 N.J. at 214, 172 A.2d 420.
Just as there is no statutory definition of “hospital purposes,” there is no statutory definition of “charitable purposes.” Our courts have concluded “charitable purposes” as used in section 54:4-3.6 is a multi-faceted term not exactly definable. As stated in Presbyterian Homes, supra:
... the term “charity” in a legal sense is a matter of description rather than a precise definition. Therefore, the determination of whether property is devoted to charitable purposes depends upon the facts or circumstances of each case. As a guide, however, it should be borne in mind that a sometimes stated justification for charitable tax exemptions is that if the charitable work were not being done by a private party, it would have to be undertaken at public expense. [55 N.J. at 285, 261 A.2d 143; citations omitted]
Hence, in order to ascertain whether Friends Home and Woods Court are devoted to and operated exclusively for chari *206 table purposes, we must examine the facts surrounding their operations.
As heretofore stated, Friends Home is a single one-story building divided into two sections: the residential care section, accommodates 60 persons, provides housing, meals and access to medical care for those persons who do not need skilled nursing care; and, the skilled nursing section, also accommodating 60 persons, provides nursing care for those persons requiring more intense medical care. The director of Friends Home testified that a person seeking admission must complete an admission application which includes the applicant’s financial statement and no person is admitted to the facility unless he or she has demonstrated the ability to pay for the services to be provided. He further claimed that although Friends Home has no written policy concerning nonpayment, no one would be asked to leave the facility if he or she became unable to pay for the charges. Both the nursing section and the residential section give priority admissions to persons transferring from lower level of care within the Friend Home/Woods Court facilities.
In 1989, the nursing section charged three separate rates for private-pay patients depending upon the size of the room and bath facilities. The charge for a semi-private room with a semiprivate lavatory was $85.50 a person, a day. For a semi-private room and private bath the charge was $90.50 a person a day; the majority of the rooms were within this class. For a private room for one person with private bath (of which there are only four) the charge was $100.50 a person a day. If two persons occupied the same room, the rates apply to each person.
For Medicaid patients, Friends Home is reimbursed by Medicaid at rates set by Medicaid based on Medicaid’s calculation of allowable costs. The rates are tiered at three levels of payment depending on the patient’s level of care. The highest charge is made for those Medicaid patients requiring skilled nursing care; slightly lower rates are set for patients receiving *207 intermediate care facilities “A”; and the lowest rate is allowed for intermediate care facility “B” patients.
In 1989, the average Medicaid reimbursement rate received by Friends Home for all three classes of patients was $67.80 a day. The administrator for Friends Home testified that they attempt to recover the difference between the amount paid on behalf of Medicaid patients and their budgeted operating-per-person cost from charitable contributions; however, their auditor stated that, in adopting their annual budget, the shortfall difference between the budgeted cost and the lower Medicaid payments was factored into the rate charges established for private-pay patients. The administrator acknowledged that if patients lost their ability to pay, 97% to 99% of them would be eligible for Medicaid. To his knowledge, only one person located there presently is neither a private-pay or Medicaid patient, and for that person, they previously received some municipal-welfare aid. He confirmed that the expense of this individual is calculated into their budgeted operating costs and is utilized in determining their annual rate schedule.
He stated, “patients are not solicited per se by Friends Home, instead, the patients apply for admission.” During his tenure, Friends Home had not admitted, to either the residential portion or the nursing section, anyone who did not have the ability to pay for the services provided. Their only active solicitation for patients is, on those occasions, when they have an empty bed in the nursing care section, and no waiting applicant. They, then, contact hospitals to submit Medicaid recipients.
When asked the hypothetical question: “If a person who did not have the ability to pay and who was not eligible for Medicaid or municipal assistance, applied for admission, would he be accepted?” He responded: “That’s difficult to answer, his application would be reviewed by the Board of Trustees; there would be a question mark.”
The administrator further testified that individuals admitted to the residential care portion of the facility would not qualify for Medicaid. As previously noted, this section, which contains *208 four separate wings, has spaces for 60 residents who are charged various monthly rates based upon the room’s size, single or double occupancy and bath facility. During 1988, the least expensive residential rate was $735 a month for a single room with a lavatory. A single room with a bath cost $785 a month. A double room with single occupancy cost $1,135 a month and a double room with double occupancy cost $1,370 a month. Approximately 36% to 44% of the admissions in their nursing care section were Medicaid patients, the balance being private-pay patients.
Friends Home’s yearly financial statement discloses the following information:
FINANCIAL STATEMENT
Total Income Gross Revenue Charitable Operating Prom Operations Market Value of Year From Operations Contributions Income/Loss & Investments Liquid Investments
1981 $1,391,000.00 $33,000.00 $ 12,000.00 $103,000.00 $ 392,540.00
1982 1,542,000.00 18,000.00 43.399.00 115.678.00 519.473.00
1983 1,601,221.00 21,000.00 37.703.00 135.872.00 889.250.00
1984 1.717.076.00 10,000.00 37.537.00 176.660.00 1.069.527.00
1985 1.809.884.00 35.000. 00 63.015.00 269.653.00 1.264.306.00
1986 1.891.392.00 20.000. 00 68.630.00 218.187.00 1.538.258.00
1987 2.011.677.00 20,000.00 105,574.00 201.551.00 546.426.00 *
1988 2.102.634.00 46,000.00 [116,384.00] 52,170.00 619.908.00
1989 2.348.996.00 34,193.00 36.096.00 208.257.00 739.067.00
In support of its claim that its operation is charitable, Friends Home emphasizes that: it is a non-profit organization, none of its income or profits inure to the benefit of any individual, but remains with the organization as a reserve for future replacements and expenses, and many volunteer hours are donated by the board of trustees and members of the community. Although Friends Home’s operation is non-profit, this alone does not justify a conclusion that the total operation is charitable. As pointedly observed by our Supreme Court, “Non-profit status, however, cannot be equated with charitableness. Rather, *209 it is but one factor which merits consideration in the determination whether property is being used for charitable purposes.” Presbyterian Homes, supra, 55 N.J. at 286, 261 A.2d 143. And, as additionally stated by the Appellate Division in Parker v. St. Stephen’s Urban Dev., 243 N.J.Super. 317, 579 A.2d 360 (App.Div.1990):
(T)he performance of useful service does not per se compel the eorollary that a corporation meets the standard for charitable immunity. Jacobs v. North Jersey Blood Center, 172 N.J.Super. 159, 411 A.2d 210 (Law Div.1979). What is required is an examination of the entity seeking to clothe itself in the veil of charitable immunity to discover its aims, its origins, and its method of operation in order to determine whether its dominant motive is charity or some other form of enterprise. [243 N.J.Super. at 324-325, 579 A.2d 360].
Anyone applying for admission to Friends Home must first fill out an application form which contains a financial statement. Friends Home then conducts a financial evaluation of that person to ascertain whether he or she can afford its charges. Admission to the residential care unit and the nursing section is granted only to those applicants who can afford to pay for the services provided. The patients of the residential section pay their expenses in full. There was no testimony offered that the operating expenses for this section exceeded its charges or that charitable contributions were necessary to sustain the residents in this section.
More than 55% of the residents in the skilled nursing section are private-pay patients. The Medicaid patients of this section had a substantial part of their cost paid by Medicaid and the balance was factored in the rate established for, and paid by, the private-pay patients. The difference between Medicaid payments and the facility’s budgeted operating-per-person costs are absorbed by the private-pay patients.
It was admitted by their auditor that the four proprietary nursing homes within the vicinity, with which he was also involved as auditor, had an average of 80% to 90% Medicaid patient population whereas, Friends Home had 36% to 44%. He acknowledged that the proprietary facilities were operating at a profit. There was no proof submitted that Friends Home’s *210 rates were less than those charged by the proprietary nursing homes within the area.
The skilled nursing care section seeks Medicaid patients via hospitals only when a vacant bed exists and they have no ready pay applicants; the facility does not actively seek admission of patients who do not have the ability to pay. Although it was alleged that patients who could no longer afford to pay would be permitted to remain, neither the by-laws nor the corporate charter obligate Friends Home to this policy. Nevertheless, their financial admission requirements thwart the probability of such an occurrence.
Unlike the facility in Presbyterian Homes, supra, which suffered a loss during the year under its appeal, Friends Home in 1989, the year under appeal, had an operating income of $36,096 and total net income from operations and investments of $208,257. Its total charitable contributions for 1989 were $34,193. From 1981 through 1989, with the exception of 1988, Friends Home annually received a net total income from operations and investments in excess of $100,000. In four of those years the total income exceeded $200,000. Their total net income for the year under appeal was $208,257, and the market value of their liquid investments totaled $739,067.
I conclude that, although charging fees to its residents and patients does not necessarily deny a charitable purpose under N.J.S.A. 54:4-3.6, the facts herein relative to the amount of fees charged, the income received, the small percentage of charitable contributions, and the failure to actively seek the admission of below-average income or indigent patients negates a charitable purpose. To constitute a charity, the institution must give substantially more to the public than it receives. Presbyterian Homes, supra, 55 N.J. at 284, n. 2, 261 A.2d 143. In this instance, the charges for services rendered to the patients have resulted in a fair margin of profit. “Charitable purposes are eleemosynary purposes, purposes connected with the distribution of charity, i.e., of aid to the needy.” Trustees of Young Men’s Christian Assn. v. Paterson City, 61 N.J.L. *211 420, 422, 39 A. 655 (Sup.Ct.1898), aff'd. o.b., 64 N.J.L. 361, 45 A. 1092 (E. & A.1899).
From the totality of the evidence submitted, I conclude that, if the patients served by Friends Home were not accepted by it, the vast majority of them more than likely would be admitted as patients of proprietary nursing homes and would not become public charges. Other than the non-profit status of Friends Home, I discern very little difference between Friends Home’s operation and that of a proprietary nursing home. Compare Weymouth Tp. v. Memorial Pk. Fam. Prac. Ctr., Inc., supra (Federally funded non-profit health services facility was not entitled to charitable exemption from real property taxation despite providing some free medical services which constituted a small fraction of its services).
Accordingly, it is determined that Friends Home has failed to carry its burden of proof to establish that its buildings are exclusively used for charitable purposes; therefore, the judgment of the Salem County Board of Taxation granting exemption to Block 27, Lot 64 is reversed and the original assessment is reinstated as follows:
Land: $ 35,000
Improvements: $903,400
Total: $938,500
Next to be addressed is Woods Court’s appeal. Woods Court’s claim for exemption is also based on charitable use. Woods Court’s certificate of incorporation, certifies that:
The purpose for which this corporation is formed is to provide residential housing for Friends and friends of Friends and those who are aged or infirm, in a true “home-like” atmosphere and an environment of love and care, and in a manner consistent with the beliefs of the religious society of Friends.
Woods Court consists of two one-story buildings connected by a short walkway. Each building contains four identical residential units, approximately 630 square feet in size. At present, all units at Woods Court are occupied pursuant to identical written leases. These dwelling leases require a $40,-000 entrance fee due at the signing of the lease, at least 50% of *212 which is refundable whenever the lease terminates. The lease may be terminated only by written notice by the tenant. The lease provides for a $30,000 refund if the lease is terminated any time during the first through the fourth month. Thus, a person who occupies Woods Court is immediately subjected to a non-refundable application fee in the amount of $10,000. From the fifth through the 23rd month thereafter, the refund decreases at the rate of $500 a month. Thereafter, no further reduction is made. Upon termination of the lease by reason of voluntary withdrawal or death, the tenant or his estate is entitled to a $20,000 refund less any unpaid rent, assessments or charges.
In addition to the entrance fee, the tenant is required to furnish his unit with the exception of carpeting, dryer, range and refrigerator. He is also required to pay in advance a monthly rental of $150 which may be increased on 60 days’ notice. On October 1, 1988, Woods Court adopted a resolution confirming its “policy of maintaining in the residence any persons who become unable to pay their regular charges subsequent to satisfying the admission requirements.”
Woods Court claims it meets the statutory criteria for “charitable purposes” under N.J.S.A. 54:4-3.6 because: (a) it is a nonprofit corporation; (b) its board of trustees are not paid; (c) its fees are below market value; (d) in addition to the housekeeping services furnished, it provides services at Friends Home to the Woods Court residents; (e) medical care as required is provided to the Woods Court residents by the nursing staff at Friends Home; and (f) it grants to these residents immediate priority admission to the nursing section of the residential facility.
Although it is alleged that the rents are below market level, Woods Court receives an initial deposit of $40,000, $10,000 of which is immediately forfeited and $10,000 is lost over the next 23 months. The full $40,000 is available to Woods Court for investment purposes. Although the residents are entitled to a refund of at least 50% should any leave, no evidence has been *213 submitted that any tenant has left. If one did leave it would be to the advantage of Woods Court since they have four people on their waiting list prepared to deposit $40,000, $10,000 of which would also be immediately forfeited. In addition, the tenants pay a monthly rent which presumably offsets all operating costs that are not covered by the non-refundable portion of the entrance fee. These monthly payments can be adjusted as costs increase.
There was no testimony respecting the financial condition or the annual income of any of these residents. There was not even an allegation that any of them has a financial problem or enjoys a below-average income. There was no testimony of prevailing rents of similar accommodations in Salem County. The mere fact that these residents are senior citizens enjoying alleged low rentals and social, and possible nursing, services does not elevate these facts to “charitable purposes.” St. Luke’s v. Peapack & Gladstone Boro. 11 N.J.Tax 76 (Tax Ct.1990). Although the services Woods Court provides to these senior citizens are laudable, they are not “charitable” within the meaning of the tax-exempt statute.
There is no evidence that these residents could not afford to pay the rentals of comparable rental accommodations. There is no evidence or allegation that, if Woods Court did not provide these services to these tenants, the general public would be required to support them. Nor is there any proof that their upkeep is partially supported by charitable monetary donations.
I conclude that the facts presented herein clearly establish that the two residential buildings of Woods Court are not exclusively used for charitable purposes.
The Salem County Board of Taxation’s judgment denying Woods Court’s application for exemption for Block 27, Lot 64.01 is affirmed.

 In 1987 the tax payer satisfied a substantial debt to the Farmers Home Administration in the form of a mortgage which reduced their investment portfolio by approximately $1,000,000. This transfer was prompted by the Farmers’ Home Administration which offered a $500,000 reduction in the principal amount of the mortgage if repayment of the outstanding balance would be made. The initial Farmers’ Home Administration mortgage was for $1,500,000.