NOT FOR PUBLICATION WITHOUT APPROVAL OF
THE TAX COURT COMMITTEE ON OPINIONS

## TAX COURT OF NEW JERSEY



**Mala Sundar**
  **JUDGE**

R.J. Hughes Justice Complex
 P.O. Box 975
 25 Market Street
 Trenton, New Jersey 08625
 Telephone (609) 815-2922
 TeleFax: (609) 376-3018
 taxcourttrenton2@judiciary.state.nj.us

February 27, 2018

Michael D. Mirne, Esq.
3200 Sunset Avenue
Ocean, New Jersey 07712

Harry Haushalter, Esq.
Lexington Square Commons
2119 Route 33, Suite A
Hamilton Square, New Jersey 08690

> Re: West Side Community Center v. City of Asbury Park
> Block 1004, Lot 2; Block 1005, Lot 1; Block 1101, Lot 6
> <u>Docket No. 008640-2016</u>

Dear Counsel,

This is the court's decision after trial on the issue of whether the above referenced three parcels ("Subject") should be granted tax exemption for tax year 2016. Plaintiff ("WSCC") claims that exemption is warranted because it is a domestic non-profit entity organized exclusively for tax exempt purposes, the Subject is being used for such purposes, and therefore, is tax-exempt under N.J.S.A. 54:4-3.6.

Defendant ("City") claims that no exemption is warranted for several reasons. The first is that Block 1004, Lot 2 ("Parcel #1") contains a gymnasium (hereinafter "Gymnasium Portion of Parcel #1"), is owned by the City <u>via</u> a final judgment in a tax sale foreclosure action. Therefore, it is already tax exempt. Second, Block 1005, Lot 1 ("Parcel #2"), which is vacant land, is also

*

owned by the City <u>via</u> a final judgment in a tax sale foreclosure action. Therefore, it is also already tax exempt. Third, plaintiff has not proven what its non-profit purpose is. Four, plaintiff has not proven that the remaining portion of Parcel #1 where a three-storied building is located (hereinafter "Building Portion of Parcel #1"), and Block 1101, Lot 6 ("Parcel #3"), which is vacant land and never previously exempt, are being used for any charitable or tax-exempt purpose, and not being conducted for profit.

For the reasons stated below, the court finds that WSCC is a non-profit entity exclusively organized for the tax-exempt purposes of the moral and mental improvement of the local community. However, the portion of the Subject not owned by the City is not entitled to a tax exemption.

## FACTS

### A. WSCC's Non-Profit Status

WSCC was incorporated in 1942. Its certificate of incorporation states its purpose is to "promote the moral, spiritual, physical, social and mental welfare of the residents of the community," and do all things necessary or incidental to achieve such purposes. By an amendment in December 15, 1988, the entity's name was changed to reflect WSCC's current name.

A certificate from the New Jersey Division of Revenue and the State Treasurer shows that WSCC's registration was revoked January 31, 1994 for failure to file annual reports, which was then reinstated January 26, 1996. As of December 14, 2015 (the date of the Treasurer's certification), WSCC was certified as "as an active business in good standing" with its annual reports remaining "current."

A September 2010 revised copy of the by-laws claims WSCC's purpose to "be a non-profit" entity for "exclusively charitable and educational" purposes. The delineated purposes were

2

to: (1) "provide recreational, cultural, educational, social and civic activities," and (2) "collaborate" with governmental "agencies to improve the systems for delivering services to the residents of [the City] and neighboring communities." WSCC was run on a non-membership basis by a Board of Trustees, which managed and controlled all the "business, property and affairs" of WSCC, through officers such as a president, secretary and a treasurer, with the president having "general charge and supervision" over WSCC's affairs. No salaries were payable to any trustee or officer, though they could be reimbursed for "reasonable expenses incurred with" the Board's approval. The by-laws also provided for six "standing committees" one of which was for fundraising, another for "program/long range strategic planning." Committee actions were to be recorded and reported to the Board of Trustees. Upon WSCC's dissolution, all debts were to be paid, and the remaining or any portion thereof, could not "be distributed to any Trustee, member of Officer" of WSCC, but had to be "distributed in accordance" with State laws "consistent with" the certificate of incorporation.

B. *Property Description*

The properties in question are as follows:

| Parcel # | Identification | Street Address | Description |
|---|---|---|---|
| 1 | Block 1004, Lot 2[1] | 115 De Witt Ave | Improved |
| 2 | Block 1005, Lot 1[2] | 129 De Witt Ave | Vacant |
| 3 | Block 1101, Lot 6 | 118 De Witt Ave | Vacant |

Parcel #1 is improved by what used to be a three-storied residence owned by a physician, which the parties referred to as WSCC's "administrative building." This building has a basement

---

[1] Per the tax assessor, up until 2012, Parcels #1 and #2 used to be known as Block 89, Lots 6-8, and Block 90, Lots 1 and 2. The assessor produced a copy of the prior tax map in this regard.

[2] See supra n.1.

3

that is used for storage. The first floor has a conference room, an office, a kitchen and a bathroom. Per the assessor, based on his personal observations, the first floor was in "fair condition."

The second floor has three rooms, all former office spaces. One such room is used by an individual (who officially became a volunteer in 2016) for his private business as a licensed contractor at no rental charge. The individual acts as the building/facilities manager at no cost to WSCC. He initially used the third floor for his business, then from 2014 onwards, used space on the second floor for that same business. This was in return for fixing the roof for free and acting as the building manager. He also performs other free services such as fixing toilets, trying to fix the furnace, and repairing sub-floors and walls. He personally incurred expenses for the parts. Initially, he had separate telephone lines placed in his office space, and was being billed separately, but later began to pay WSCC an agreed-to percentage of the internet/telephone bills and "overages" on other utilities. He conducts his regular business in this space, including meeting clients, and has a key to the building.

According to the assessor's inspection, the second floor was in fair-to-poor condition with some code violation issues. Due to plumbing issues, there were water leakage onto the first floor. To prevent leaks, the water was turned off, making the bathroom a non-operable. There was a deadbolt on the emergency escape. A "Do Not Use" sign was taken down due to the cleaning in preparation for the assessor's inspection. He noted the rooms on the second floor had little furniture/supplies. WSCC disputed the assessor's observations by claiming each room was a class room equipped with a TV, bookshelves, books, tables, a large projection TV, and a drum set, which were set up when the assessor was there for the interior inspection. No photographs were provided by WSCC in this regard.

4

The third floor is finished. It was previously used by the licensed contractor for his business until 2012. The assessor was not given access to this portion during his inspection. According to WSCC's president for the Board of Trustees, it is being used for WSCC's office work, and for storage of WSCC's books and records.

The Building Portion of Parcel #1 is separated from the Gymnasium Portion of Parcel #1 by a driveway. The assessor's interior inspection showed that the Gymnasium Portion of Parcel #1 to be in very poor condition, with major wear-and-tear issues such as leaking roofs, large part of the floor area covered with tarpaulin, wall cracks and the like.

WSCC's witnesses agreed that the Building Portion of Parcel #1 and the Gymnasium Portion of Parcel #1 were in need of repairs and maintenance, with issues as to roof, water in walls and ceilings, pest infestation, basement flooding, and vandalism. The furnace in the Building Portion of Parcel #1 was not functional, thus, had no heat. The furnace was replaced in 2016 with funds obtained from the City at WSCC's request. WSCC also requested assistance from the City in 2015 due to its "dire need of immediate short-term facility improvements," such as "a new heating system, roof repairs and the refurbishment of [the] gymnasium floor."[3] However, WSCC did not receive any citations for municipal safety code violations.

Parcel # 2 is vacant land, and is adjacent to Parcel #1. It is not being used for any purpose and is un-maintained.

---

[3] In that 2015 request, WSCC offered the Subject to the City noting that the "existing physical plant and vacant lot" was "ideal for the development of a mixed use project that could be used" by WSCC and the City. WSCC also noted that the Subject had "previously been identified as a site for a police sub-station while being included in every city planning document for the past" twenty years.

Parcel # 3 is vacant land, and located across the street. It was intended to be used as an overflow parking lot, however, is never used due to ample free street parking, and the City's "walkable community" status. It is unpaved and not maintained.

*C. Revocation of Subject's Exemption*

It is undisputed that the Subject has been exempt from local property tax for an extended period of time, starting sometime in 1942. For tax years 2014 and 2015, Parcels #1 and #2 were classified as tax exempt Class 15F property which refers to property exempt for reasons other than those specifically described in the regulations. See N.J.A.C. 18:2.2(q). Parcel #3 was never tax exempt, and has always been taxed as Class 1 property which refers to taxable vacant land. See N.J.A.C. 18:12-2.2(a).

In December of 2014, the City's assessor became aware, through a series of local newspaper articles, that WSCC's federal non-profit status (under I.R.C. §501(c)(3)) was revoked. This instigated his decision to investigate WSCC's non-profit status and use for local property tax exemption purposes. By notice dated March 18, 2013, the IRS stated that, effective May 15, 2012, WSCC's tax exemption status was revoked since it had failed to file an annual information return (federal Form 990) for three consecutive years, and was "no longer tax-exempt," thus, could not receive tax-deductible contributions. WSCC's federal tax exempt status remains revoked.

Since the assessor had already filed a preliminary tax list for tax year 2015 granting an exempt status to the Parcels #1 and #2, he filed tax appeals before the Monmouth County Board of Taxation ("County Board") challenging the exemptions. However, he withdrew the appeals after discussions as to the loss of the federal tax exempt status with Ms. Ross, president of WSCC's Board of Trustees, wherein she assured him that she was addressing that issue, and based on the Division of Revenue's certification dated January 19, 2015 that WSCC was a New Jersey non-

profit entity in good standing. He followed up by sending WSCC a letter to this effect, and noted that his office would "require" WSCC's 501(c)(3) status to be "in good standing" by the next assessment date of October 1, 2015 (for tax year 2016) for the exemption to continue. The 10-month period would also allow the assessor to perform his due diligence as to whether the Subject should be tax exempt for local property tax, and for WSCC to satisfy the assessor in this regard.

Sometime in April of 2015, the assessor mailed a Statement of Exemption to all churches and non-profit entities in the City, including WSCC, as part of his general review and audit of exemption claims by these entities. He sent another reminder notice in August of 2015 to WSCC and other non-responders. In late October 2015, WSCC submitted two statements titled "Further Statement of Organization Claiming Property Tax Exemption," for Parcels #1 and #2. They noted that the "initial" statement was filed June 26, 1942 and that the parcels were exclusively, and entirely, being "used for originally stated purposes" of WSCC. It further noted that no commercial business was being conducted on premises, and no individual was receiving any amount or form of compensation.

During this time the assessor had periodically inspected the Subject externally (drive-by) from February 2015 onwards on various days and times (the Subject being proximate to his home and to work). He saw no activity or signs of the same. He had several conversations with Ms. Ross on the Subject's use and the 501(c)(3) status, but never received any objective or documentary information that would provide him a "comfort level" on resolution of these issues.

By letters dated October 27, 2015, the assessor revoked the exempt status for Parcels #1 and #2, for tax year 2016. This was because WSCC failed to provide its 501(c)(3) status and also because the "property was not operated in substantial part in accordance with the purpose[s] listed on the Certificate of Incorporation" as of the assessment date. The parcels were thus reclassified

as Class 4A (income producing) and Class 1 (taxable vacant land) respectively.  See N.J.A.C. 18:12-2.2(a); (e).  The assessment for each of the three parcels for 2016 was as follows:

| Parcel # | Land | Improvements | Total |
|---|---|---|---|
| 1 | $109,400 | $767,500 | $876,900 |
| 2 | $ 41,600 | $0 | $ 41,600 |
| 3 | $ 47,600 | $0 | $ 47,600 |

*D.  WSCC's Petition to the County Board and Appeal*

In January of 2016, WSCC filed three petitions before the County Board for each of the three parcels appealing the denial of tax exemption for each parcel (even though the assessor had not denied an exemption for Parcel #3).  WSCC's former counsel requested the County Board to dismiss the petitions without prejudice.  Despite this request and instead of using judgment code 6 ("dismissal without prejudice"), the County Board issued three judgments affirming the assessments using judgment code 2B ("presumption of correctness not overturned").

Sometime in early 2016, the assessor discovered that due to outstanding sewer tax liens, the City had, via a final foreclosure judgment dated March 15, 1996, obtained legal title and ownership to the Gymnasium Portion of Parcel #1 and to the entire Parcel #2 (when they had a different identification numbers.  See supra n.1.).[4]  Since this meant that these parcels were already tax-exempt, thus, his initial exemption revocation in this regard was erroneous, he filed a "correction of errors" petition before the County Board seeking a reduction of the assessment on Parcel #1.  The reduction was to account for the assessed value of the Gymnasium Portion of Parcel

---

[4] By resolutions numbered 2017-15 and 2017-178, the City (by its Mayor and City Council) authorized the City's attorney to prepare documents, including a quit claim deed, so that title to the Gymnasium Portion of Parcel #1 and to Parcel #2, be transferred back to WSCC.  The resolutions recited that the City had obtained title through an in rem foreclosure proceeding which culminated into a final foreclosure judgment dated March 15, 1996, however, this was an "administrative" error since the lien underlying the judgment had been "satisfied" by WSCC.  By another resolution numbered 2017-212, the City authorized cancellation of tax sale certificate (#16-00074) for Parcel #2, and a refund of taxes paid by a third-party holder of that certificate, since this parcel was erroneously foreclosed upon.  However, none of the formalities for transfer of titled have been completed.

8

#1. The County Board entered a judgment reducing the assessment to the requested amount of $301,400. No "correction of errors" petition was filed as to the Parcel #2.[5]

WSCC timely appealed the three County Board judgments issued in WSCC's name, to this court. It agreed that as to Parcel #1, the County Board had reduced the assessment. The City did not file any counterclaim or cross-appeal. WSCC conceded that it would not challenge the valuation aspect of any parcel since it was only seeking an exemption for the same.

*E. Evidence As to Use*

According to WSCC's witnesses, the entirety of Parcel #1 was used for various purposes geared solely towards benefit of the local community. These included social gatherings, recreational activities, community and church events, political events, Thanksgiving dinners, toy donations, job training forums, educational opportunities, meetings of other tax-exempt entities, and WSCC's office meetings.[6] All events were organized and run by volunteers. The frequency of the events was "on an as needed basis/request by community residents and organizations."

The Gymnasium Portion of Parcel #1 was rented for birthday parties, coming-of-age parties, wedding receptions, or funeral services, at a fee which depended on the number of guests. The Board's president surmised that such events occurred between two to five times in 2015, and

---

[5] For tax year 2017, the assessor created a new lot 2.01 (with a street address of 113 De Witt Avenue) to represent the Gymnasium Portion of Parcel #1. He also classified this portion as Class 15C (which refers to "public property," which terms is defined to include "real property" owned by, among others, a local government and "devoted to public uses." See N.J.A.C. 18:12-2.2(n)). The assessor similarly re-classified Parcel #2 from Class 1 to Class 15C, by filing a "correction of errors" before the County Board for tax year 2017. WSCC has filed an appeal for tax year 2017, however, it is not consolidated with the instant case.

[6] For instance, meetings were held with disabled war veterans on a weekly basis in the Building Portion of Parcel #1. After-school tutoring initiatives was run once a week by a Ms. Boyton, mostly in the Gymnasium Portion of Parcel #1, but the pre-planning lessons and activities were in the Building Portion of Parcel #1. "My Sistas Mentoring Program" was run on Wednesdays by a Ms. Morgan. "WSCC Food Panty" was held on Thursdays and run by a Mr. & Mrs. Turner. Church services of "Agape Life Changing Worship Center" were held by Pastor Lightsey (an employee at the Ocean County Department of Juvenile Services) weekly on Sundays. Health & Wellness Programs were offered during summer of 2015 at the gym every Tuesday (at a $20 registration charge).

that the extremely modest charges ranged between $150 (funeral services) to $1,000. Although WSCC claimed that decisions as to such rentals were pursuant to Board approval, memorialized through resolutions and maintained in physical files, no resolutions were provided to the court.

The assessor refuted claims of activities at the Subject based on his periodic drive-by inspections. He drove-by several times on the days and times that WSCC alleged certain activities were scheduled (such as mentoring programs on Wednesdays and church services on Sundays), but found no signs of persons, or cars, or any activity. He found both buildings locked, and there was no response to his knocks on the door. His inquiries as to the status of the lack of heat in the Building Portion of Parcel #1, expected date when both buildings on Parcel #1 would be operational, the nature of use of the Building Portion of Parcel #1, and literature on WSCC's activities, went unanswered.

WSCC claimed that both buildings had to always be locked due to their close vicinity to a crime-ridden neighborhood (drugs, gang violence, and shootings). Due to these safety issues, the contractor volunteer did not allow admittance to anyone unless specifically permitted by Ms. Ross.

In December 2016, the assessor attempted an interior inspection with the City's fire chief/assistant manager. There were seven individuals at the administrative building, including Ms. Ross (president), a Board member, two Reverends, and three volunteers. The assessor was not allowed to take photographs of any portion of the interior after some individuals protested on grounds that the only issue in litigation was the "use" of the property, not its condition, therefore, the pictures of the building on a day when there was no activity scheduled, were irrelevant. Ms. Ross then called WSCC's former counsel, who telephonically objected to the assessor's attempt to take any pictures. Ms. Ross' also asked the assessor to delete the three photographs he had just taken, telling him that the buildings on Parcel #1 were seldom used due to "physical plan issues,"

lack of heat, and lack of funding. The assessor could not inspect the third floor of the Building Portion of Parcel #1 since it was locked. All individuals who were present of behalf of WSCC during such inspection claimed not to have a key to the same.

*F. Not-For-Profit Conduct*

According to WSCC's Board's president, money donations were received and were deposited in a bank account. Checks issued from this account required signatures of herself and WSCC's Treasurer. No bank statements or other details (name of the bank or type of account) were provided in support. Neither were account books, ledgers, or excerpts therefrom (duly certified).

Expenses for the Subject were for repairs, maintenance, tax, utility bills, and insurance. There was also repayment of a line of credit of about $15,000 which was incurred to pay for the sewer tax lien on one parcel. There was no mortgage. No Board member received any type of remuneration. Bills were paid, sometimes, using Ms. Ross' personal funds, for which she was reimbursed. WSCC did not provide any record of entries endorsing either receipts, or expense payments and reimbursements. However, it is undisputed that WSCC had sought for, and received, a grant from the City for the furnace replacement of $27,525.

As noted above, WSCC also received income from renting the space at the Gymnasium Portion of Parcel #1 for weddings and receptions to local residents, who paid by cash or check. No bank or other financial statement was provided to show income from these events.

Ms. Ross claimed that federal Form 990 was filed for tax year 2016, however, did not provide it to the City or to the court. Thus, there was no information as to the amount of contributions, grants, or other gifts, if any, details of other income, expenses, assets, or liabilities.

Nor was there any documentary evidence of the financial operations of its business. Ms. Ross claimed she never brought such documents to court because the City did not ask her to.

According to the City's Manager, who is responsible for the day-to-day operations of the City, the City wanted (and still wants) to assist WSCC, and was/is fully supportive of WSCC's plans to promote community outreach. This was also one of the reasons that the City favored WSCC request for funds to replace the boiler. Funds were provided from the Community Development Block Grant ("CDBG") Program[7] for this purpose in 2016 by deeming WSCC's request as an "emergency" situation.

In 2017, pursuant to a random audit for fiscal year 2015, the federal Department of Housing and Urban Development ("HUD") expressed concern about the grant provided to WSCC. The City represented to HUD that the City's drive-by inspection "confirmed" that WSCC was "never operational," and "was not a functioning neighborhood center." HUD noted that WSCC had denied HUD "access" to the Building Portion of Parcel #1 "to view the boiler system replacement." This access denial, in addition to a finding that the City lacked documentation of WSCC's "activity," specifically that "[n]o public service activity at [WSCC] could be documented," including WSCC's "non-profit status," HUD cited the City for being non-complaint with the CDBG Program's requirements. As a result, HUD disallowed the grant of $27,525 (i.e., the City had to repay these funds to the HUD).[8] The City did not appeal HUD's determination because, while arguably the grant to WSCC qualified as emergency funds required to protect health and

---

[7] Under this Program, established under 42 U.S.C. §5301, the federal government grants funds to local governments to assist in providing decent housing and suitable living environments to people of low and moderate income.
[8] Among others, the City was also cited for failing to have a "management system for oversight" of its grant recipients, such as for instance, failing to have on file, an "amended subrecipient agreement and/or executed change order" for WSCC.

safety, the City could not defend WSCC's non-profit entity status due to zero documentation and zero co-operation from WSCC and its Board's president.

The assessor also testified that despite several efforts, he was unable to procure any documentation evidencing WSCC's income/expenses to insure that WSCC was not operating for profit. He tried to google WSCC and did not find any useful information in this regard, such as types of non-profit activities being conducted, and stated that he was hearing for the first time (during testimony) that the Gymnasium Portion of Parcel #1was being rented for third-party non-charitable events, and that the for-profit licensed contractor was conducting his private business in the office space at the Building Portion of Parcel #1. He also conducted an investigation into the requirements to obtain a "certificate of good standing" and found (by performing a test online registration) that the online registration did not require any financial data, or documentation as to financial reporting, nor indicated that financial information was evaluated before issuing a certificate of good standing.

## ANALYSIS

Tax exemption statutes are strictly construed against those claiming exemption because of the compelling public policy that each property bear its fair share of the burden of taxation. Paper Mill Playhouse v. Township of Millburn, 95 N.J. 503, 506-07 (1984). The burden of persuading the court that a tax exemption is merited is on the claimant, "even when the county board has granted exemption and the appeal is by the municipality." Borough of Woodstown v. Friends Home at Woodstown, 12 N.J. Tax 197, 203 (Tax 1992).

N.J.S.A. 54:4-3.6 grants local property tax exemption to land and building depending on the use, user, and owner. One such grant is for "all buildings actually used in the work of associations and corporations organized exclusively for the moral and mental improvement of

13

men, women and children." Id. However, "if any portion of a building used for that purpose is leased to profit-making organizations or is otherwise used for purposes which are not themselves exempt from taxation, that portion shall be subject to taxation and the remaining portion only shall be exempt. Ibid.

Another grant of exemption is for "all buildings actually used in the work of associations and corporations organized exclusively for . . . charitable purposes." Ibid. Here also, "if any portion of a building used for that purpose is leased to a profit-making organization or is otherwise used for purposes which are not themselves exempt from taxation, that portion shall be subject to taxation and the remaining portion shall be exempt from taxation." Ibid. However, "if any portion of a building is used for a different exempt use by an exempt entity, that portion shall also be exempt from taxation." Ibid.

An exemption is also granted for the land on which the above buildings are constructed provided it "is devoted to the" the statutory tax exempt purpose "and to no other purpose." Ibid. However, the exemption is only for land not in excess of five acres. Ibid.

In addition to the actual use and exclusive organization in the above statutory provisions, (1) "the buildings, or the lands on which they stand, or the . . . corporations . . . using and occupying them," should not be "conducted for profit;" (2) the corporate claimant must "own[] the property in question;" (3) the corporate claimant should be "incorporated or organized under" New Jersey laws; and, (4) the corporate claimant must be "authorized to carry out the purposes on account of which the exemption is claimed." Ibid.

An exception to the prong barring any activities "conducted for profit," is where the building and land "used for charitable, benevolent or religious purposes" and the "charitable, benevolent or religious work therein carried on is supported partly by fees and charges received

14

from or on behalf of beneficiaries using or occupying the buildings." Ibid. However, the condition to this is that the "building is wholly controlled by and the entire income therefrom is used for said charitable, benevolent or religious purposes." Ibid.

In Paper Mill, 95 N.J. at 506, the Court explicated the requirements for an exemption as a three-prong criteria. First, the claimant "must be organized exclusively for" the statutorily stated purpose. Second, the property must be actually used for the tax-exempt purposes. Third, the "operation and use of its property must not be conducted for profit." Precedent has also always required a "confluence" of ownership and use as of the assessment date for the tax exemption to apply. Bethany Baptist Church v. Township of Deptford, 225 N.J. Super. 355, 360 (App. Div. 1988).

Before the court applies the three-prong criteria, it has to first decide whether WSCC can claim exemption for the Gymnasium Portion of Parcel #1 or for Parcel #2 due to the City's ownership of the same via foreclosure. The court finds that WSCC cannot make such claim.

Generally, a tax sale certificate, which is the vehicle to enforce a municipal tax lien, is not an "absolute conveyance," and thus, does not "divest the property owner of title." City of Northfield v. Zell, 12 N.J. Tax 180, 184 (Tax 1991) (citations and quotations omitted). This is due to the statutory right of redemption. Ibid. See also Township of Jefferson v. Block 447A, Lot 10, 228 N.J. Super. 1, 4-5 (App. Div. 1988) ("[P]urchase of the certificate at a tax sale does not divest the delinquent owner of his title to the land.").

"Unless redemption occurs, however, a purchaser who forecloses on the tax certificate becomes the owner of the property in fee simple." Simon v. Cronecker, 189 N.J. 304, 318 (2007) (citing to N.J.S.A. 54:5-87). See also Lato v. Township of Rockaway, 16 N.J. Tax 355, 361 (Tax 1997) ("[U]nder N.J.S.A. 54:5-85 to -104, foreclosure of the right to redeem a tax sale certificate

15

is a strict foreclosure, enabling the certificate holder to acquire fee simple title directly without a public auction"). Thus, a tax sale certificate holder has a "distinctive property interest" which is its "right, by foreclosure, to acquire title to the property covered by the certificate." Id. at 364.

Here, the City's title to these parcels, through statutory tax liens reduced to a final foreclosure judgment, was confirmed by the title search performed by the assessor, and also referenced in the City's 2017 resolutions. In response, WSCC's Board's president simply stressed that it was her belief that WSCC owned all three parcels. However, no documents were provided to show dispute the validity or finality of the foreclosure action through which the City obtained title. Nor was there any evidence of WSCC's clear title to these two parcels or that WSCC was, or is involved in litigation, to vacate those foreclosure judgments. In fact, it was WSCC which introduced into evidence the City's resolutions that title should be re-conveyed to WSCC, as proof that the title to the two parcels should have been transferred back to WSCC. While this is true, it is also true that title was yet to be re-conveyed as of the assessment date.

Since WSCC was not the title owner to the Gymnasium Portion of Parcel #1, and to Parcel #2, it cannot challenge a denial of an exemption for the same. Here, especially, such a challenge is moot because these properties have been classified as exempt by the City, thus, no local property taxes are being imposed upon, or sought from, WSCC.

The court now addresses whether WSCC has satisfied its burden of proving that it meets the three-prong criteria for exemption as to the Building Portion of Parcel #1 and to Parcel #3.

Given the language in WSCC's organizational documents, the court is satisfied that for purposes of N.J.S.A. 54:4-3.6, WSCC was organized for furthering the "moral and mental improvement of men, women and children." See e.g. Phillipsburg Riverview Organization, Inc. v. Town of Phillipsburg, 26 N.J. Tax 167, 176 (Tax 2011) ("The moral and mental improvement

classification has been applied to various public and civic organizations, which directly serve the public by contributing to the educational, cultural and spiritual development in society in general.") (citation omitted), aff'd, 27 N.J. Tax 188 (App. Div. 2013).  Therefore, WSCC satisfies the first prong of the criteria explicated in Paper Mill, 95 N.J. 503.

As to the second prong (actual use), clearly, a portion of the second floor cannot be exempt because of its use by a for-profit business, thus, is being used "for purposes which are not themselves exempt from taxation."  N.J.S.A. 54:4-3.6.  The fact that the for-profit contractor was not paying rent to WSCC does not require a different conclusion.  WSCC allowed him to occupy space and conduct his for-profit activities (initially on the third floor, then on the second floor), in return, and in consideration, for his services to WSCC.  The in-kind rental payment is not reason to grant exemption. .  See e.g. Phillipsburg Riverview, 26 N.J. Tax at 182 ("paying of rent for use of space" is not the controlling factor where the issue is the "use of the Subject property by for-profit" entities, and if so proven, then, the non-profit property owner is deemed to be "support[ing] the profitable activities of [those] separate for-profit entities").  The use of the third floor was not satisfactorily substantiated because the assessor was, undisputedly, not permitted access.  Although WSCC claimed it was used to store WSCC's books and records, the fact that none of them were produced (see infra) renders this assertion questionable.  As to the first floor of the building, the testimony, as a whole, regarding its physical condition and use,[9] allows this court to find that it was used in furtherance of WSCC's tax-exempt purpose of either performing administrative duties (meetings or planning events), and holding meetings for the disabled

---

[9] In this connection, the court notes that WSCC's decision not to permit the assessor to take photographs or even to voluntarily provide pictures to the court because the legal issue is "use" not "condition" is not well taken.  Photographs can show what is contained in a room, and enhances the court's understanding of whether it is, or can be used, for the alleged asserted purposes.  In its absence, (especially when there is an ability to provide pictures, even if the provider is the assessor), the tax exemption claimant's testimony becomes somewhat self-serving, thus, not as weight-worthy.

veterans. Thus, this portion would be tax exempt. Therefore, WSCC partially satisfies the requirements of the second criteria in regards to a portion of the Building Portion of Parcel #1.

As to the third prong of the exemption test, WSCC provided absolutely no objective evidence in support thereof. While the organizational documents forbids distribution upon WSCC's dissolution to any of its trustee, member or officer, this is not the end of the inquiry. If it were, then, the inquiry as to the third prong could only occur after the non-profit entity has ceased to exist. Clearly, the Legislature could not have so intended. As pointed out aptly in Cascade Corp. v. Township of Middle, 323 N.J. Super. 184, 189 (App. Div. 1999), "since nonprofit status is a prerequisite to [an entity's] exemption, financial data assists the tax assessor in determining, in any particular instance, whether not-for-profit corporate status is merely a form which is not borne out by fiscal reality." See also 1711 Third Ave., Inc. v. City of Asbury Park, 16 N.J. Tax 174, 184 (Tax 1996) (mere testimony that taxpayer seeking exemption "operated at a deficit" without any corroborating "financial statements" is insufficient to prove the third prong of the exemption criteria). Here, the glaring absence of any documents, books, records, financial statements, lack of informational tax returns (federal Forms 990 applicable to tax-exempt entities[10]), combined with the admission that income is received from non-tax exempt activities such as rentals, does not aid WSCC's cause in satisfaction of this prong. It may be that monies are coming in through non-tax exempt activities (rentals for parties or receptions), however, it is not known where it is being expended. It may be that they are used to defray running expenses of the administrative building, but without objective evidence in this regard, the court cannot so

---

[10] The court does not require Forms 990 to ascertain the entity's federal tax-exempt status, since such status has no bearing for purposes of N.J.S.A 54:4-3.6. Additionally, the court's findings are not in any manner influenced by HUD's audit of the City. That event is unrelated to the tax exemption at issue here, other than to peripherally point out that no financial information was forthcoming even in the HUD proceedings.

conclude. WSCC asserts that the documents were not produced because the City did not request the same. However, this assertion is meritless. The matter is on trial before this court, with the burden upon WSCC since it is the claimant seeking the exemption. That burden of proof and persuasion is not satisfied by arguing that the City should have forced its production. Further, the court agrees with the assessor that issuance of a certificate in good standing by the State's Division of Revenue is not equal to, or replaces, the proofs required to meet this prong of the exemption.

Because of WSCC's complete failure to satisfy the court that it met the requirements of Prong 3 of the exemption criteria, the court finds that the Building Portion of Parcel #1 is not entitled to tax exemption. Each of the three-part criteria must be satisfied. Thus, although the court has found that WSCC satisfies the first criteria, and the second criteria (as to the first floor of the building), WSCC's failure to meet the third criteria deprives it of a legitimate claim to an exemption for the entire Building Portion of Parcel #1 at issue here.

The court also finds that because of the above holding, Parcel #3 is not entitled to an exemption. "Vacant land is entitled to no exemption under N.J.S.A. 54:4-3.6." Salvation Army v. Township of Alexandria, 2 N.J. Tax 292, 296 (Tax 1981). The statutory exemption is primarily on the "buildings," thus, for land to be exempt, it "must be associated with and be necessary for the enjoyment of buildings." Ibid. See also City of Hackensack v. Hackensack Med. Ctr., 9 N.J. Tax 460, 462 (Tax) ("Land is exempt under N.J.S.A. 54:4-3.6 only as an incident to the exemption of buildings erected thereon."), aff'd, 114 N.J. 498 (1988). Here, since the court has found that the Building Portion of Parcel #1 is not exempt, the overflow parking lot (Parcel #3) cannot be exempt. The court also notes that the lot is unimproved, not paved, not maintained, and never actually used. Cf. Planned Parenthood of Bergen County, Inc. v. City of Hackensack, 12 N.J. Tax 598, 617-618 (Tax 1992), aff'd, 14 N.J. Tax 171 (App. Div. 1993) (the parking lot across the street

19

was exempt because it was actually used by the employees, mostly female, and provided to them as an incentive and for their safety due to "night-time security and limited off-street parking.").

## CONCLUSION

For the aforementioned reasons, the court finds that WSCC is a non-profit entity and is organized for the tax-exempt purposes of moral and mental improvement of the local community for purposes of N.J.S.A. 54:4-3.6.

Since the City owns the Gymnasium Portion of Parcel #1, and Parcel #2, WSCC's challenge to the denial of an exemption on these parcels is moot. To this extent, the County Board's judgments as Gymnasium Portion of Parcel #1, and Parcel #2 will be affirmed but for the reason that the City owns the same, and therefore, these parcels are already exempt.

The Building Portion of Parcel #1 and Parcel #3 are not entitled to a tax exemption. The court therefore affirms the County Board's judgments in this regard. Since WSCC is not challenging the valuation aspect of the assessments. (Parcel #3: $47,600; Building Portion of Parcel #1: $301,400), the court will issue a final order and judgment in this regard.

Very truly yours,

Mala Sundar, J.T.C.

20